No. 64,714

SHERRY TAIWO and OBAFEMI TAIWO, *Appellees*, v. KIM PHAN THI VU, *Appellant*.

(822 P.2d 1024)

Opinion filed December 6, 1991.

*Roger L. Sherman*, of Overland Park, argued the cause and was on the brief for appellant.

*Neil B. Foth*, of Foth & Reynolds, of Overland Park, argued the cause and was on the brief for appellees.

The opinion of the court was delivered by

ABBOTT, J.: Sherry and Obafemi Taiwo filed a civil suit against Kim Phan Thi Vu alleging assault, battery, false imprisonment, and intentional infliction of emotional distress (the tort of outrage). The jury awarded $20,000 to the Taiwos, and the trial judge assessed $3,000 in punitive damages. Ms. Vu appealed to the Court of Appeals. The Court of Appeals set aside the judgment and remanded for a new trial in an unpublished decision filed October 12, 1990. We granted the Taiwos' petition for review.

The underlying facts, when viewed in a light most favorable to the party who prevailed at the trial court level, are as follows.

In August 1988, Ms. Vu hired Sherry Taiwo, a certified school-teacher, to bring Ms. Vu's day-care center, Peppermint Patty's Daycare Center in Overland Park, Kansas, into compliance with state laws. Mrs. Taiwo soon resigned because Ms. Vu would not agree to follow state laws.

About three o'clock in the afternoon on August 31, 1988, Mrs. Taiwo and her husband, a Nigerian national, went to Peppermint Patty's to pick up Mrs. Taiwo's final paycheck. Ms. Vu repeatedly refused to give the check to either Mrs. Taiwo or Mr. Taiwo. A

disagreement ensued, and Ms. Vu called the police. Ms. Vu told Officer Dennis R. Baldwin that Mrs. Taiwo's check would not be ready until around 6 p.m. Mrs. Taiwo agreed to come back later.

When the Taiwos returned to the day-care center at the appointed hour and Mrs. Taiwo went inside to pick up her check, Ms. Vu initially refused to give Mrs. Taiwo her paycheck. Ms. Vu eventually prepared a check; however, the rate of pay had been reduced from $4.50 to $3.35 an hour, and the number of hours had been cut. Mrs. Taiwo and Ms. Vu argued about the check. Then, Ms. Vu shoved Mrs. Taiwo in the chest and told her to take the check or leave it. Mrs. Taiwo asked, "Why are you doing this?" Ms. Vu replied, "Because you quit I'm going to inconvenience you." Ms. Vu then left the building, locking Mrs. Taiwo inside the day-care center. After Mrs. Taiwo discovered she was locked inside, she attempted unsuccessfully to attract her husband's attention through a window. As she was looking through the window, Mrs. Taiwo saw Ms. Vu walk behind the Taiwos' car and write something down. Ms. Vu then came back inside the day-care center, called the police, and reported that "a black man [is] sitting out in my parking lot vandalizing my car."

Officer Baldwin arrived 10 to 20 minutes later and talked with the Taiwos outside of the day-care center. Mrs. Taiwo explained the problem with the check. Baldwin suggested to the Taiwos that they contact an attorney because the difference in Mrs. Taiwo's pay was not subject to criminal law. After the Taiwos accepted the check and left, Ms. Vu then came outside to talk with the officer. Ms. Vu reported that Mr. Taiwo broke the rear window of her van. Baldwin regularly patrolled the parking lot. He previously had noticed the same damage to the rear window while on routine patrol and thus knew the accusation was false.

The next morning Ms. Vu went to the Overland Park Police Department. Ms. Vu reported that Sally Matthies, who worked at the Town and Country Store (which is across the street from Peppermint Patty's), had seen a black male damaging Ms. Vu's Cadillac (a different vehicle than the van) and had taken down the suspect's license plate number. Ms. Vu told the police she thought a former employee had done the damage. Ms. Vu then

signed a police report. The following affirmation immediately preceded her signature:

"I am aware of the fact that it is unlawful to make a false report to a police officer. I affirm the above information is true and I wish to assist in the prosecution of any persons responsible for the above-described offense. I understand this data may be computerized in local, state, and national files."

A check on the license plate number referred the police to the Taiwos. Detective Jesse Rollwagen sent Mr. Taiwo a letter, stating that a vandalism report had been filed with the Overland Park Police and that Mr. Taiwo's license plate number had been given as belonging to the suspect.

Upon receipt of the letter, the Taiwos immediately called Rollwagen and repeatedly asserted their innocence. The Taiwos agreed to and did take polygraph tests on September 17, 1988.

Sally Matthies, the alleged eyewitness, first told police she had witnessed the Taiwos vandalizing the Cadillac. After the police received the results of the polygraph tests, Rollwagen again contacted Sally Matthies. She quickly recanted her story. She told Rollwagen she did not work at Town & Country, but was actually employed by Ms. Vu and Ms. Vu had instructed her to lie to the police.

Rollwagen contacted Ms. Vu again. After she reiterated the same story, Rollwagen told her Sally Matthies had recanted her story and he knew Sally was one of Ms. Vu's employees. In response, Ms. Vu claimed the name of the witness was Sally Matty, then Sally Martin, and finally Mary Ann Martin. Ms. Vu challenged the detective to prove the Taiwos had not damaged her vehicle.

Rollwagen informed the Taiwos they would not be prosecuted. A complaint was filed against Ms. Vu for filing a false police report. The charge, however, was dropped because Sally Matthies failed to appear at two court dates to testify.

When the Taiwos filed this action against Ms. Vu, Ms. Vu filed a counterclaim. She alleged Mrs. Taiwo breached an oral employment contract because Mrs. Taiwo failed to appear for work on August 18 and 19, 1988, and did not give notice. Ms. Vu also claimed Mr. Taiwo assaulted her. Prior to trial, the trial court granted, with prejudice, Ms. Vu's motion to dismiss her counterclaim.

The case was tried in the District Court of Johnson County, Kansas, on December 11 and 12, 1989. After the Taiwos rested their case, Ms. Vu moved for a directed verdict on all counts. The trial court took the matter under advisement. Ms. Vu presented no evidence on her behalf, and the case was submitted to the jury. The jury found for the Taiwos, awarding $20,000 in damages. A general verdict form was used. The jury also found that the trial court should be permitted to impose punitive damages. After a hearing pursuant to K.S.A. 1990 Supp. 60-3702, the court assessed $3,000 in punitive damages against Ms. Vu. Additionally, the trial court denied Ms. Vu's motion for directed verdict on all counts.

Ms. Vu timely appealed to the Court of Appeals and raised three issues. She argued that the trial court erred in not granting her motion for directed verdict on the tort of outrage because her behavior did not constitute outrageous conduct, that the trial court erred in not granting her motion for directed verdict on the tort of assault because the evidence was insufficient to prove assault, and that the jury awarded excessive damages.

The Court of Appeals panel ultimately held that the trial court took Ms. Vu's motion for a directed verdict under advisement and did not rule on it until after the jury had returned its verdict. The court found that *Roberts v. Saylor*, 230 Kan. 289, 637 P.2d 1175 (1981), requires a trial court to make two threshold determinations regarding a tort of outrage claim *before* the case is submitted to the jury. Here, the jury verdict was in the form of a general verdict. Because a general verdict makes it impossible to ascertain what portion of the damages was awarded for the tort of outrage, the Court of Appeals panel ordered the entire judgment set aside and remanded the case for retrial. We granted review.

The Court of Appeals' ruling, that *Roberts v. Saylor* requires the trial court to resolve whether the two threshold determinations regarding a tort of outrage claim have been made *before* the case may be submitted to the jury, is based upon the following language in *Roberts*:

"Liability for extreme emotional distress has two threshold requirements which must be met and which the court must, *in the first instance*, determine . . . ." 230 Kan. at 292. (Emphasis added.)

"*In the first instance* the court must determine if these threshold requirements have been met. If the court determines from the pleadings, stipulations, admissions, and deposition of the plaintiff that reasonable fact finders might differ as to whether defendant's conduct was sufficiently extreme and outrageous as to subject him to liability for emotional distress, and if the court further determines plaintiff's emotional distress was such that reasonable fact finders might differ as to whether plaintiff's emotional distress was genuine and so severe and extreme as to result in liability, then and only then, it must be left to the jury to determine liability based on the evidence at trial." 230 Kan. at 294. (Emphasis added.)

The issue in *Roberts* was whether the motion for summary judgment had been overruled properly. The Taiwos argue that "[t]he Court of Appeals has taken this summary judgment test, which admittedly applies *in substance* to motions for directed verdict and concludes that this language imparts a new *procedural* requirement to motions for directed verdict on the tort of outrage."

An earlier tort of outrage case, *Dawson v. Associates Financial Services Co.*, 215 Kan. 814, 529 P.2d 104 (1974), involved a motion for directed verdict. In *Dawson,* a creditor harassed a debtor even though the creditor knew the debtor was ill. Because of the harassment, the debtor's health worsened.

In discussing the court's duty to determine outrageous conduct in a debtor-creditor relationship and when a jury question exists, this court stated:

"In ruling on a motion for a directed verdict the court is required to resolve all facts and inferences, reasonably to be drawn from the evidence, in favor of the party against whom the ruling is sought, and [if] the evidence is such that reasonable minds could reach different conclusions thereon, the motion must be denied and the matter submitted to the jury. [Citation omitted.] Comment *h* under § 46(1) of the Restatement of Torts (Second), establishes that it is for the court to determine, *in the first instance,* whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery, or whether it is necessarily so, and [if] reasonable men may differ, the question is for the jury to determine." (Emphasis added.) 215 Kan. at 824.

For tort of outrage cases using the "first instance" language, see, *e.g., Moore v. State Bank of Burden,* 240 Kan. 382, 388, 729 P.2d 1205 (1986), *cert. denied* 482 U.S. 906 (1987); *Burgess v. Perdue,* 239 Kan. 473, 475, 721 P.2d 239 (1986); *Neufeldt v. L. R. Foy Constr. Co.,* 236 Kan. 664, 667-68, 693 P.2d 1194 (1985); *Hanrahan v. Horn,* 232 Kan. 531, 536, 657 P.2d 561 (1983);

*Dotson v. McLaughlin,* 216 Kan. 201, 210-11, 531 P.2d 1 (1975); *Bradshaw v. Swagerty,* 1 Kan. App. 2d 213, 216, 563 P.2d 511 (1977).

K.S.A. 1990 Supp. 60-250(c), in pertinent part, provides:

"Whenever a motion for a directed verdict made at the close of all the evidence is denied or *for any reason is not granted,* the court is deemed to have submitted the action to the jury subject to a later determination of the legal questions raised by the motion." (Emphasis added.)

This case falls within the language of the statute, "[w]henever a motion for a directed verdict made at the close of all the evidence . . . for any reason is not granted . . . ." Here, at the close of all the evidence, the trial court took Ms. Vu's motion for a directed verdict under advisement and then submitted the case to the jury. Because the motion was not granted, the court was deemed to have submitted the tort of outrage claim to the jury, subject to the trial court ruling at a later date on any legal questions raised by the motion, including the two threshold requirements that must be met and that the trial court is required to determine prior to submitting a tort of outrage case to a jury. K.S.A. 1990 Supp. 60-250(c) does not require that a trial court rule on a directed verdict motion before the case may be submitted to the jury. The statutory language does not provide for any exceptions.

Ms. Vu argues that the directed verdict statute is procedural while the *Roberts* threshold requirements are substantive. We are of the opinion that K.S.A. 1990 Supp. 60-250(c) controls and that the trial court did not err in submitting the case to the jury before ruling on the motion for directed verdict. *Cf. City of Haven v. Gregg,* 244 Kan. 117, 122-23, 766 P.2d 143 (1988) ("When a statute conflicts with the common law, the statute controls.").

In *Sampson v. Hunt,* 233 Kan. 572, 578, 665 P.2d 743 (1983), this court discussed the standard for appellate review of a directed verdict motion.

"In ruling on a motion for directed verdict pursuant to K.S.A. 60-250 the court is required to resolve all facts and inferences reasonably to be drawn from the evidence in favor of the party against whom the ruling is sought, and where the evidence is such that reasonable minds could reach different conclusions thereon, the motion must be denied and the matter submitted

to the jury. The same basic rule governs appellate review of a motion for directed verdict. (Citations omitted.] . . . Even where facts are undisputed it is possible that conflicting inferences may be drawn from those facts, and where that is true, the issue must be submitted to the jury."

This court has defined the tort of outrage as follows:

"One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress. [Citations omitted.] Proof of four elements is required to establish the cause of action: (1) The conduct of defendant must be intentional or in reckless disregard of plaintiff; (2) the conduct must be extreme and outrageous; (3) there must be a causal connection between defendant's conduct and plaintiff's mental distress; and (4) plaintiff's mental distress must be extreme and severe.

"Liability for extreme emotional distress has two threshold requirements which must be met and which the court must, in the first instance, determine: (1) Whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery; and (2) whether the emotional distress suffered by plaintiff is in such extreme degree the law must intervene because the distress inflicted is so severe that no reasonable person should be expected to endure it." *Roberts*, 230 Kan. at 292-93.

Ms. Vu claims that the Taiwos failed to prove the extreme and outrageous conduct requirement. In *Roberts*, this court discussed what type of conduct is extreme and outrageous enough to permit recovery.

"In *Dotson v. McLaughlin*, 216 Kan. at 210, Mr. Justice Prager speaking for the court adopted guidelines from the Restatement of Torts. It was pointed out that recovery must depend on the facts and circumstances of each case but liability may only be found in those cases where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond the bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society. It was further said liability may be found to exist generally in a case when the recitation of facts to an average citizen would arouse resentment against the actor, and lead that citizen to spontaneously exclaim, 'Outrageous!'

"It should be understood that liability does not arise from mere insults, indignities, threats, annoyances, petty expressions, or other trivialities. Members of the public are necessarily expected and required to be hardened to a certain amount of criticism, rough language and to occasional acts and words that are definitely inconsiderate and unkind. The law should not intervene where someone's feelings merely are hurt. Freedom remains to express an unflattering opinion and to blow off relatively harmless steam which comes from an uncontrollable temper. Conduct to be a sufficient basis for an action to recover for emotional distress must be outrageous to the

point that it goes beyond the bounds of decency and is utterly intolerable in a civilized society." 230 Kan. at 293.

Ms. Vu attempts to defeat the extreme or outrageous conduct requirement by arguing the police followed routine procedure in questioning the Taiwos, sending the letter to Mr. Taiwo, and encouraging the Taiwos to submit to polygraph tests. The extreme and outrageous conduct in question here concerns Ms. Vu's behavior, not the conduct of the police. The uncontested evidence reflects that her behavior was intentional and malicious: She assaulted, battered, and falsely imprisoned Mrs. Taiwo; she first lied to a law enforcement officer when she called the police and then she lied to Officer Baldwin, both times claiming Mr. Taiwo had vandalized her van; she filed a false police report against the Taiwos concerning her Cadillac; Ms. Vu then induced an employee to lie to the police about the Taiwos' involvement in vandalism and when she was confronted, she challenged Detective Rollwagen to prove the Taiwos had not committed the vandalism.

The Taiwos' claim is distinguishable from our prior cases involving the tort of outrage. Here, Ms. Vu's liability did not arise from mere insults, indignities, threats, annoyances, petty expressions, or other trivialities. This was not a matter of the Taiwos' feelings merely being hurt. Ms. Vu's conduct cannot be explained as simply expressing her opinion or the result of a mistaken belief. She abused the criminal justice process to her own ends. Even when the police gave her the opportunity to correct her story, she refused. Reasonable people could regard her behavior as atrocious and utterly intolerable in a civilized society. If reasonable people do not agree on whether Ms. Vu's behavior was outrageous, then the question should be submitted to the jury.

Ms. Vu also contends that the Taiwos failed to show they suffered extreme and severe mental distress. Again, the *Roberts* court discussed this requirement.

"The second threshold requirement which must be met and which the court must first determine as present is that the plaintiff's emotional distress is sufficiently severe, genuine and extreme that no reasonable person should be expected to endure it.

"Emotional distress passes under various names such as mental suffering, mental anguish, nervous shock, and includes all highly unpleasant mental

reactions, such as fright, horror, grief, shame, embarrassment, anger, chagrin, disappointment, and worry. However, it is only when emotional distress is extreme that possible liability arises.

"The extreme distress required must be reasonable and justified under the circumstances, and there can be no liability where the plaintiff has appeared to suffer exaggerated and unreasonable emotional distress, unless it results from a peculiar susceptibility to such distress of which the actor had knowledge. [Citations omitted.] The emotional distress must in fact exist, and it must be severe." 230 Kan. at 293-94 (citing Prosser, Law of Torts 59 [4th ed. 1971]).

Ms. Vu argues there is no evidence that the Taiwos suffered extreme and severe mental distress. She points out that neither of the Taiwos consulted a doctor or mental health professional, neither exhibited any physical symptom of extreme stress such as weight fluctuation, and neither missed any time from work because of stress.

In contrast, the Taiwos contend that Ms. Vu's "deceitful abuse of our police resources" wrought "three weeks of fear, uncertainty, humiliation, mental anguish, interrogations, and electronic probing [from the polygraphs]" upon the Taiwos. The Taiwos cite to the jury's verdict as evidence of the extreme and severe mental distress endured by the Taiwos.

"The jury, who had the benefit of observing the witnesses' demeanors and the [Taiwos'] emotions on the stand, were clearly outraged by [Ms. Vu's] actions. The fact that they awarded $20,000.00 is also strong evidence that they felt [the Taiwos] had suffered genuine emotional distress that was extreme and severe."

This court has adopted Restatement (Second) of Torts § 46(1) (1963); comments j and k to that section are instructive:

"The law intervenes only where the distress inflicted is so severe that no reasonable man could be expected to endure it. The intensity and the duration of the distress are factors to be considered in determining its severity. Severe distress must be proved; but in many cases the extreme and outrageous character of the defendant's conduct is in itself important evidence that the distress has existed. . . .

"The distress must be reasonable and justified under the circumstances, and there is no liability where the plaintiff has suffered exaggerated and unreasonable emotional distress, unless it results from a peculiar susceptibility to such distress of which the actor has knowledge. . . .

"It is for the court to determine whether on the evidence severe emotional distress can be found; it is for the jury to determine whether, on the evidence, it has in fact existed.

. . . .

"Normally, severe emotional distress is accompanied or followed by shock, illness, or other bodily harm, which in itself affords evidence that the distress is genuine and severe. The rule stated is not, however, limited to cases where there has been bodily harm; and if the conduct is sufficiently extreme and outrageous there may be liability for the emotional distress alone, without such harm. In such cases the court may perhaps tend to look for more in the way of outrage as a guarantee that the claim is genuine; but if the enormity of the outrage carries conviction that there has in fact been severe emotional distress, bodily harm is not required."

Mrs. Taiwo testified she was fearful and very upset when Ms. Vu pushed her; she did not know what Ms. Vu would do next. Mrs. Taiwo was afraid when Ms. Vu locked her inside the day-care center that she would leave her there. Mrs. Taiwo was upset, scared, and felt taken advantage of when the Taiwos received the letter from Detective Rollwagen and when it appeared the police did not believe the Taiwos were innocent of the charges. She was fearful of taking the polygraph test. Until the police notified the Taiwos that all charges against them were being dismissed, Mrs. Taiwo was worried they might be arrested. She worried about what else could happen.

Mr. Taiwo testified that he was scared when he received the letter from Rollwagen. He said he was "really, really scared" to take the lie detector test. Being from Nigeria, he did not know how the police or criminal justice system in this country works. He was scared he was going to go to jail even though he had not committed a crime. Additionally, he had heard of a Nigerian living in the United States who had been killed while in jail.

Rollwagen testified that after receiving his letter, the Taiwos telephoned him several times to assert their innocence. The Taiwos were very upset when they called.

Ms. Vu's conduct by itself is important evidence that the Taiwos' distress existed. See Restatement (Second) Torts § 46(1) comment j. She falsely accused the Taiwos of breaking the law. She filed a false report with the police. She induced an employee to lie—to tell the police the employee was an eyewitness to the alleged crime. The Taiwos spent two to three weeks attempting to convince the police they were innocent. There was little they could do, other than take the polygraph tests, to prove they did not vandalize either of Ms. Vu's vehicles.

In our opinion, the enormity of the outrage created by Ms. Vu's conduct is sufficient to satisfy the second threshold requirement of severe and extreme mental distress. Thus, the trial court did not err in submitting the case to the jury.

As her second issue, Ms. Vu claims there was insufficient evidence to prove assault. The jury was instructed on the elements of an assault, pursuant to PIK Civ. 2d 14.01: "An assault is an intentional threat or attempt, coupled with apparent ability, to do bodily harm to another, resulting in immediate apprehension of bodily harm. No bodily contact is necessary."

Ms. Vu argues that the element of "immediate apprehension of bodily harm" was not proven. Her argument is based upon Mrs. Taiwo's testimony that she did not think Ms. Vu was going to beat her up and the fact that Mrs. Taiwo stayed in the same room with Ms. Vu after Ms. Vu shoved her. Mrs. Taiwo also testified that she was scared and upset; she did not know what Ms. Vu was going to do to her next. The requirement of "immediate apprehension of bodily harm" does not require that the victim believe the aggressor is going to beat or severely injure the victim. Mrs. Taiwo's testimony supports the inference that she was in immediate apprehension of bodily harm. The trial court did not err in submitting this claim to the jury.

For her final issue, Ms. Vu maintains that the jury award of $20,000 is excessive. She claims that the Taiwos failed to show actual damages and that the Taiwos are entitled to nominal damages only for the torts of battery and false imprisonment. In contrast, the Taiwos contend the jury verdict is not excessive because they have suffered mental anguish and emotional distress, indignity, humiliation, and inconvenience.

" 'An examination of the numerous cases challenging the sufficiency, or insufficiency, of a verdict reveals no simple, symmetrical pattern or design. Each case seems to stand on its own facts. . . .'

. . . .

"An appellate court should be cautious when requested to substitute its judgment for that of the trier of fact that heard the case." *McGuire v. Sifers*, 235 Kan. 368, 373, 681 P.2d 1025 (1984).

On the four counts of assault, battery, false imprisonment, and the tort of outrage, it cannot be said the amount of damages was so excessive that it shocks the conscience of the court.

The record fails to show that Ms. Vu requested a special verdict form or requested that interrogatories accompany the general verdict. See K.S.A. 60-249. On appeal, the appellant has the burden to show error. *Hartman v. Stumbo,* 195 Kan. 634, 637, 408 P.2d 693 (1965). Additionally, it is the appellant's burden to designate a record sufficient to establish the claimed error. *Dickinson, Inc. v. Balcor Income Properties Ltd.,* 12 Kan. App. 2d 395, 399, 745 P.2d 1120 (1987), *rev. denied* 242 Kan. 902 (1988).

If there has been no request for a special finding of fact, a general verdict resolves all controversial issues in the prevailing party's favor. *Rowhuff v. Kansas Turnpike Authority,* 182 Kan. 748, 751, 324 P.2d 147 (1958). Ms. Vu did not designate a record sufficient to establish her claim of excessive damages. A reasonable person could find that, under the facts of this case, $20,000 is not an excessive award for assault, battery, and false imprisonment.

Ms. Vu also alleges that from the following statement contained in the police report she signed the jury concluded the Taiwos had been damaged because their names were listed in police records: "I understand this data may be computerized in local, state and national files." While deliberating, the jury sent the trial judge the following question: "Can the computer (National Crime Computer) records be changed so it will not reflect badly on Mr. Taiwo? If the records are not changed, what will they say?" The judge responded: "It is your obligation to reach your decision based upon the evidence as submitted and the instructions given you by the Court."

In her brief to the Court of Appeals, Ms. Vu included an affidavit from an Overland Park prosecutor who swore that the computer records show no criminal charges have been filed against the Taiwos. The affidavit is not part of the record. Furthermore, according to the record, Ms. Vu did not object to the introduction of the police report containing that statement. She also did not object when the statement was read to the jury. A verdict will not be set aside or a judgment reversed because of the erroneous admission of evidence unless the complaining party timely objected. K.S.A. 60-404, nor may a party raise an issue of this nature for the first time on appeal.

The judgment of the Court of Appeals reversing the district court and remanding for new trial is reversed. The judgment of the district court is affirmed.